# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| **In the Matter of the Search of**     ) | |
| ) | |
| A cellular telephone belonging to Kenneth Robinson   ) | Case No. 25-sw-00724-CYC |
| associated with number (502) 656-9509     ) | |
| ) | |
| ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Possession of a machine gun |
| 21 U.S.C. 841 | Distribution of a controlled substance |
| 18 U.S.C. § 371 | Conspiracy to commit crimes agains the United States |
| 18 U.S.C. § 922(a)(6) | False statement in connection to purchase of a firearm |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Zachary Adams*
*Applicant's signature*

SA Zachary Adams, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: <u>May 16, 2025</u>

*Judge's signature*

City and state: <u>Denver, CO</u>

The Hon. Cyrus Y. Chung
United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**LOCATIONS TO BE SEARCHED**

1. **Subject Device**: The cell-phone associated with phone number (502) 656-9509 and recovered from Kenneth ROBINSON on 05/08/2025 during execution of Federal Search Warrant #25-SW-00661-SBP currently in ATF custody and subject to forensic examination by ATF Denver personnel pursuant to the search warrant. The subject device is further identified as an iPhone 15 Plus with serial #JHFMVGWJ4H

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

1. All evidence, fruits, and instrumentalities of violations of 18 U.S.C. 922(a)(6) – false statements to a firearms dealer, 18 U.S.C. 922(o) – unlawful possession of a machinegun, 21 U.S.C. §841 – distribution of a controlled substance, and 18 U.S.C. 371 from the time period encompassing 09/14/2020 through 05/08/2025, including but not limited to the following items:

    a. The assigned telephone of the cellular phone or identifying information about the device (ESN, MIN, IMSI, or IMEI);

    b. The electronically stored phone book or contact list;

    c. The call log to include the record of incoming, outgoing, and missed calls;

    d. All voice messages recorded on the device as these voicemails pertain to the identity of the device owner/user, the identity of known and unknown co-conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

    e. All sent, received, and composed text messages as these text messages pertain to the identity of the device owner/user, the identity of known and unknown co-conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

    f. All sent, received, and composed email messages as these emails pertain to the identity of the device owner/user, the identity of known and unknown co-

conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

g.  All stored photographs and videos pertaining to the identity of the device owner/user, the identity of known and unknown co-conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

h.  All GPS information stored on the device and any information to include cell site information or metadate which would indicate the device's location;

i.  Internet searches as these searches pertain to the identity of the device owner/user, the identity of known and unknown co-conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

j.  All notes stored on the device as these notes pertain to the identity of the device owner/user, the identity of known and unknown co-conspirators, discussions pertaining to the acquisition and distribution of firearms, the manufacture, acquisition, or distribution of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics;

k.  Social media applications present on the device, including but not limited to Instagram, Facebook, and Snapchat, as these applications may contain GPS and location information indicating where the phone has been used; photographs

and/or videos showing the identity of the device owner/user, the identity of known and unknown coconspirators, and the planning or fruits of the acquisition and/or distribution of firearms and machine guns, the manufacture of machineguns, and the acquisition, manufacture, possession, or distribution of illicit narcotics.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Zachary Adams, a Special Agent (S/A) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1.  Your Affiant, Zachary Adams, is a Special Agent (S/A) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, Colorado Springs, Colorado. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in the United States Code. I am authorized under Federal Rule of Criminal Procedure 41(a)(1)(C) as a federal law enforcement officer who is engaged in enforcing the criminal laws, and am within any category of officers authorized by the Attorney General to request a search warrant.

2.  Your Affiant has been an ATF Special Agent for over three years. Your Affiant is a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ATF National Academy's Special Agent Basic Training. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking, and conspiracy laws. Your Affiant has participated in numerous federal firearms and narcotics investigations as an ATF Special Agent in which narcotics and firearms used in violation of federal law have been recovered. Your Affiant also conducted and/or participated in such investigations as a sworn police officer in the State of Illinois. Prior to becoming an ATF Special Agent, Your Affiant was a Police Officer

1

with the Chicago Police Department in Chicago, IL for over three and a half years. As a Police Officer, Your Affiant was assigned to a patrol team in the Bureau of Patrol. Your Affiant's duties involved responding to calls for service, crowd and event management and police response, and proactive policing. Prior to and during Your Affiant's time as a sworn Police Officer and Special Agent, Your Affiant has been an enlisted member of the United States Army Reserves since 2011.

3. Your Affiant has received training and instruction related to investigating firearms trafficking, straw purchasing, and conspiracy laws. Your Affiant works with and benefits from the knowledge of other law enforcement officers with decades of experience enforcing federal firearms laws and investigating firearms trafficking, straw purchasing, and conspiracy violations. Your Affiant investigates federal firearms laws, illegal firearms trafficking laws, and conspiracy laws in the normal course of his duties and is familiar with the facts of this case.

**AFFIDAVIT PURPOSE**

4. This affidavit is submitted in support of an application for a search warrant to search the cell-phone (cellular device, or "subject device") belonging to Kenneth ROBINSON (DOB: 10/13/1991) and identified as associated with the phone number (502) 656-9509. The subject device is further identified in **Attachment A**.

5. The applied-for warrant would authorize the forensic examination of the device identified in ***Attachment A*** for the purpose of identifying electronically stored data particularly described in ***Attachment B***. Based on the information below, there is probable cause to believe the device described in ***Attachment A*** contain(s) evidence described in

2

*Attachment B*. As set forth below, there is probable cause to believe that the device contains evidence of one or more of the following violations of federal law:

a. Possession of a machine-gun, in violation of Title 18, United States Code 922(o);

b. Providing false statements to a firearms dealer, in violation of Title 18, United States Code 922(a)(6);

c. Conspiracy to commit the above listed violations, in violation of Title 18, United States Code 371;

d. And, the manufacture, distribution, dispensation, or the possession with intent to manufacture, distribute, or dispense illegal narcotics, in violation of Title 21, United States Code 841(a).

6. Your Affiant has obtained the facts set forth in this affidavit through Your Affiant's personal participation in the investigation described below, from oral and written reports of other law enforcement officers participating in this and related investigations, and from records, documents, and other evidence obtained during this investigation. Due to the limited scope of this affidavit, Your Affiant has not included every fact known concerning this investigation. Your Affiant has set forth only the facts that Your Affiant believes are essential to establish that probable cause exists in support of an Application for a Search Warrant for the device more fully described in *Attachment A*.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

7. Based on his training and experience, Your Affiant knows the following about cellular phones hereinafter and below and in the Attachments "device(s)".

8. Most cellular telephones are equipped with a digital camera. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable digital storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards and miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages. If the camera is equipped with global positions system ("GPS") technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

9. A wireless telephone (or mobile telephone, or cellular telephone, or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones/ A wireless telephone usually contains a "call log" which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These

4

capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet including websites, social media sites, bulletin boards, file sharing, and other internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card – such devices can store any digital data, and have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and contain software programs called applications or "apps". Apps, like programs on a

5

personal computer, perform different functions and save data associated with those
functions. Apps can, for example, permit accessing the Web, sending and receiving e-
mail, and participating in internet social networks. Those programs can perform different
functions and save data associated with those functions, including use associated with the
internet.

10. A GPS navigation device uses the Global Positioning System to display its current
location. It often contains records of the locations where it has been. Some GPS
navigation devices can give a user driving or walking directions to another location.
These devices can contain records of the addresses or locations involved in such
navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting
the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly
transmits by radio a mathematical representation of the current time, combined with a
special sequence of numbers. These signals are sent by radio, using specifications that are
publicly available. A GPS antenna on Earth can receive those signals. When a GPS
antenna receives signals from at least four satellites, a computer connected to that antenna
can mathematically calculate the antenna's latitude, longitude, and sometimes altitude
with a high level of precision.

11. Digital storage devices can include all types of electronic, magnetic, optical,
electrochemical, or other high speed data processing devices performing logical,
arithmetic, or storage functions, including desktop computers, laptop computers, mobile
phones, pagers, tablets, server computers, game consoles, and network hardware and also
includes any physical object upon which computer data can be recorded such as hard disk

drives, solid state drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical media.

12. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

13. Based on Your Affiant's knowledge, training, and experience, examining data stored on cellular telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the device(s).

14. There is probable cause to believe that things that were once stored on the devices may still be stored there, for at least the following reasons

    a. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being

used by an active file – for long periods of time before they are overwritten. In addition, a computer or device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, digital storage devices can contain electronic evidence of how a digital storage device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operation system or application operation, file system data structures, and virtual memory "swap" or paging files. Digital storage device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache." Forensic review may also disclose when and by whom the internet was used to conduct searches, view material, and communicate with others via the internet.

15. *Forensic evidence*. As further described in ***Attachment B***, this application seeks permission to locate not only electronically stored information on the device(s) that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices were used, the purpose of the use, who used the devices, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames, usernames, and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Digital storage devices' file systems can record information about the date files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a digital storage

9

device is evidence may depend on other information stored on the digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving the acquisition, distribution, and manufacture of firearms and/or narcotics, the individuals electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime(s). The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime(s). Based on training and experience, Your Affiant believes that an electronic device used to commit crimes of this type may contain: calls, voicemails, text messages, and application based messages between individuals involved in the acquisition, distribution, and manufacture of firearms, including machineguns, and/or narcotics; GPS searches and information associated with traveling in order to acquire or distribute firearms, ammunition, narcotics, and/or materials necessary for their manufacture; photographs and/or videos exchanged between individuals involved in the acquisition or distribution of firearms, ammunition, and/or narcotics, and the manufacture of the same; social media apps

10

such as Facebook, Instagram, or Snapchat where the phone owner may be communicating with others regarding the acquisition or distribution of firearms, machineguns, ammunition, and/or narcotics or manufacturing of the same; email accounts with emails containing communications related to the acquisition or distribution of firearms, machineguns, ammunition, and/or narcotics; and apps such as CashApp or messages related to financial transactions in conjunction with the acquisition or distribution of firearms, ammunition, machineguns, and/or narcotics, or the manufacture of the same. Additionally, devices are often used to call, text, send photos and/or email information to criminal associates before, during, and after crimes to assist in the crimes both in planning, executing, and the aftermath of crimes, and that information is likely contained in the memory of the cell phone. In addition, people involved in the unlawful acquisition, distribution, possession, and or manufacturing of firearms, machineguns, and/or narcotics likely communication using texts, email, or by phone to plan, execute, discuss the results of, or cover up, the crime(s).

g.   Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format (such as saving a .pdf image file as a .doc document file), or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

16. *Need to review evidence over time and to maintain entirety of evidence*. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in

11

*Attachment B* in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, Your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your Affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in *Attachment B*. In order to obtain the full picture and meaning of the data from the information sought in *Attachments A and B* of this application, the Government

would need to maintain access to all of the resultant data, as the completeness and potential probative value of the data must be assessed within the full scope of the investigation. As such, Your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit seizing, imaging, copying and reviewing the contents of the device consistent with the warrant. The warrant Your Affiant is applying for would authorize a later examination and perhaps repeated review of the device or information from a copy of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

18. During, or about, October 2024, the ATF Colorado Springs Field Office (CSFO) began an investigation into Kenneth ROBINSON (DOB: 10/13/1991) in relation to suspected firearms trafficking activity.

13

*Firearms Trafficking*

19. Your Affiant learned initial information resulting from a query of law enforcement databases that ROBINSON was the purchaser of several firearms recovered in law enforcement activity. ROBINSON is not believed to have been present for any of these recoveries.

20. On 05/10/2023, the Colorado Springs Police Department (CSPD) recovered a Glock, 19, 9mm, pistol, bearing serial #BFLT404 ("Firearm #1"). Firearm #1 was recovered from Irvin Daniel VILLA (DOB: 02/27/2004). At the time of recovery, VILLA would have been nineteen (19) years of age and unable to conduct the lawful purchase of a handgun from a Federal Firearms Licensee (FFL) on his own. ROBINSON purchased Firearm #1 on 03/02/2023 from Acme Pawnshop, Inc., a FFL located at 2311 E Platte Ave, Colorado Springs, CO 80909. The date of purchase and the date of recovery result in a time-to-crime ("TTC", the measurement of days between the known purchase of the firearm and it's recovery by law enforcement) of sixty-nine (69) days.

    a.  Your Affiant queried law enforcement databases and determined that the above recovery of Firearm #1 was likely in connection with criminal charges filed against VILLA related to homicide. These charges were filed on or about 05/11/2023 and VILLA was subsequently convicted of Aggravated Robbery and sentenced to five (5) years probation in case #2023CR2074 in the 4th Judicial District of El Paso County, CO.

21. On 01/26/2023, the CSPD recovered a Springfield Armory, SA-35, 9mm, pistol, bearing serial #BA232152 ("Firearm #2"). Firearm #2 was recovered from Michael TAYLOR (DOB: 05/01/1986). TAYLOR is a multi-convicted felon with convictions in the state of

14

Colorado, the earliest known felony conviction for whom is from 2005 and related to burglary. While this conviction might not prohibit TAYLOR from possessing firearms under Colorado law, it would still serve as a prohibition against ownership, possession, access to, or purchase of firearms under 18 U.S.C. § 922(g)(1). ROBINSON purchased Firearm #2 on 12/24/2021 at Acme Pawnshop, Inc., which results in a TTC of three-hundred-ninety-eight (398) days.

22. On 08/07/2021, the Louisville Metro Police Department (LMPD), in Louisville, KY, recovered a Canik, TP9-SF Elite, 9mm, pistol, bearing serial #18BH05977 ("Firearm #3"). Firearm #3 was recovered from Justin PATTERSON (DOB: 09/04/1999). No known prohibition against possession or ownership of firearms or ammunition existed for PATTERSON as of the time of this recovery. ROBINSON purchased Firearm #3 on 07/02/2021 from Acme Pawn North, a FFL located at 3955 N Academy, Colorado Springs, CO 80917, which results in a TTC of thirty-six (36) days.

23. On 06/30/2021, the Fayetteville Police Department (FPD), in Fayetteville, NC, recovered a Taurus, PT140, .40 caliber, pistol, bearing serial #SAN29081 ("Firearm #4"). Firearm #4 was recovered from Tre'darren BONNER (DOB: 07/08/1999) in relation to a shooting for which charges were later dismissed or otherwise disposed of prior to final adjudication. No known prohibition against possession or ownership of firearms or ammunition existed for BONNER as of the time of this recovery. ROBINSON purchased Firearm #4 on 04/03/2021 from EZPawn, a FFL located at 1230 N Academy Blvd, Colorado Springs, CO 80909, which results in a TTC of eighty-eight (88) days.

a. Through the course of this investigation, Your Affiant learned that BONNER and ROBINSON are believed to be half-brothers. Further, BONNER and ROBINSON currently are believed to reside at the same residential location believed to be 735 Descendant Dr, Fountain, CO 80817.

24. Your Affiant learned of an additional firearm recovery by the Thornton Police Department (TPD) in Thornton, CO. On 06/30/2024 TPD personnel recovered, but at the time this information was learned had not submitted for tracing purposes, a Glock, 43, 9mm, pistol, bearing serial #ADZE227 ("Firearm #5"). Your Affiant spoke with TPD personnel and learned that Firearm #5 was recovered from Jason SISLER (DOB: 06/15/1975). SISLER is a multi-convicted felon with convictions in the state of Colorado, the earliest known felony conviction for whom is from 2010 and related to robbery. This would likely create a prohibition against ownership under Colorado law and would certainly create a prohibition against the ownership or possession of firearms under 18 U.S.C. § 922(g)(1) for SISLER. ROBINSON acquired Firearm #5 on 08/14/2023 from Acme Pawnshop, Inc. In the absence of a firearms trace report which provides a calculated TTC, Your Affiant utilized an open-source date range calculator to determine that the recovery and purchase dates resulted in a TTC of three-hundred-twenty-two (322) days.

25. Following, and throughout, inquiries into the above-described recovered firearms, Your Affiant visited and made contact with numerous FFLs located in the Colorado Springs, CO, area to obtain purchase, sales, and acquisitions records related to ROBINSON's acquisition of firearms. Your Affiant learned that ROBINSON had purchased

16

approximately fifty-five (55) firearms between 09/14/2020 and 10/4/2024. For approximately five (5) of these firearms the original purchase date remains unknown.

26. In reviewing these records, Your Affiant observed that of the approximately fifty-five (55) firearms known to have been purchased or acquired by ROBINSON, including the above-mentioned recovered firearms but not including any outstanding firearms currently unknown, approximately thirty (30) acquisitions are repetitive. The thirty (30) repetitive acquisitions consist of nine (9) varying types of firearms. The distribution of those nine (9) types of firearms is as described below:

    a. In the listed time frame, ROBINSON acquired approximately two (2) Springfield XD45, .45 caliber, pistols;

    b. In the listed time frame, ROBINSON acquired approximately four (4) Glock, 22, .40 caliber, pistols;

    c. In the listed time frame, ROBINSON acquired approximately three (3) Anderson Manufacturing, AM-15, AR-type firearms;

    d. In the listed time frame, ROBINSON acquired approximately three (3) Radical Firearms, RF_15, AR-type firearms;

    e. In the listed time frame, ROBINSON acquired approximately two (2) Spikes Tactical, ST-15, AR-type firearms;

    f. In the listed time frame, ROBINSON acquired approximately five (5) Glock, 43, 9mm, pistols;

        i. One (1) of these Glock 43 pistols is referred to above in Paragraph 24 as Firearm #5;

g.  In the listed time frame, ROBINSON acquired approximately six (6) Glock, 19, 9mm pistols, including one variant produced by Glock known as a 19X;

   i.  One (1) of these Glock 19 pistols is referred to above in Paragraph 20 as Firearm #1;

h.  In the listed time frame, ROBINSON acquired approximately three (3) Combat Armory, CA 19, pistols which are designed to replicate Glock pistols including the Glock 19;

i.  In the listed time frame, ROBINSON acquired approximately two (2) Glock, 20, 10mm, pistols.

j.  Some of the repeat purchases, indicated above, specifically subparagraphs (c), (d), (e), and (h) leave open the possibility that the firearms maintain slight variations in terms of caliber or other features, but the make and model are the same as known by Your Affiant.

27. On 04/02/2025, Your Affiant learned of an additional two (2) firearms known to have been acquired by ROBINSON. Your Affiant queried law enforcement databases and learned that on 03/29/2025 ROBINSON initiated the purchase of two (2) pistols from First Cash Pawn #362, a FFL located at 348 Main St, Security, CO 80911. These two firearms are described below:

a.  Glock, 23, .40 caliber, pistol, bearing serial #MBV872;

b.  Glock, 45, 9mm, pistol, bearing serial #BLDW757.

28. As of 04/02/2025, the total number of firearms known to have been acquired, purchased, possessed, transferred to or by, ROBINSON, is approximately fifty-seven (57) not withstanding the possibility of an unknown number of transactions or acquisitions that

remain unknown. For purposes of information contained throughout the remainder of this affidavit, Your Affiant is acknowledging the purchases initiated on 03/29/2025 but referring to data as reported prior to Paragraph 27 and encompassing the time period of 09/14/2020 through 10/4/2024.

29. Based on Your Affiant's training, knowledge, and experience, the acquisition history, when considered in the context of the repetitive transactions and acquisitions (described above in Paragraph 26) and the recoveries by Law Enforcement described in Paragraphs 19 through 24, is indicative of potential violations of the United States Code in relation to firearms trafficking, conspiracy, and straw purchasing. Your Affiant is also relying on his training, knowledge, and experience to assert that even where the final destination or recipient of firearms acquired by ROBINSON is unknown or suspected, the behavior patterns are indicative of purchasing firearms for the purpose of future resale regardless of whether that future resale is known by ROBINSON at the time of purchase.

### *Financial Means*

30. Your Affiant caused a query of the Colorado State Department of Labor to occur which produced information related to known income reported by, or on behalf of, ROBINSON. This query identified gross wages of approximately $150,005.56 covering the period of time from the first quarter of 2020 through the third quarter of 2024 amounting to approximately fifty-seven (57) months. This total over time resulted in an approximate monthly average of $2,631.67 in gross wages.

31. Your Affiant also reviewed additional financial information which indicated that ROBINSON had taken in approximately $251.00 and $39,348.00 through peer-to-peer transactions. In these same datasets, Your Affiant observed that ROBINSON paid out to

19

other peers in the amounts of approximately $201.43 and $24,043.40, resulting in a net gain of approximately $15,354.17 between 01/01/2021 and 01/09/2025. This results in an approximate additional monthly average of $320 in peer-to-peer transactions, for a total monthly combined financial availability of $2951.54 and does not account for cost-of-living payments or taxation.

32. An open-source tax calculator, located at https://smartasset.com/taxes/paycheck-calculator#3FCZ4fzEyU, with one (1) federal, state, and local allowance each, projected that a monthly gross total of $2951.54 (expanded to an annual total of $35,418) would result in a monthly net income amount of $2,461, or $1,136 if generated bi-weekly.

33. The total purchase price for each individual firearm acquired by ROBINSON is unknown, but based on some known purchase costs exceeding $600 and various open-source prices for similar firearms purchased new, an average acquisition cost of $350 is estimated for purposes of this paragraph. At an average cost of $350, ROBINSON spent approximately $19,250 on firearms in the timeframe encompassed by the dates of 09/14/2020 (third quarter of 2020) through approximately 10/04/2024 (fourth quarter of 2024). This time frame amounts for approximately forty-eight (48) months and an average expenditure on firearms of approximately $401.04 each month. This average expenditure on firearms, which does not account for accessories or ammunition generally implied in the ownership and use of personal firearms, would reduce the estimated net monthly income of ROBINSON to approximately $2060 and still does not account for cost-of-living payments or other expenditures related to quality of life.

34. On or about 04/29/2025, Your Affiant learned of information that appeared to indicate ROBINSON, or an individual believed to be his spouse, had also been receiving unemployment insurance payments for a period of time. Your Affiant learned that between November, 2023, and January, 2024, ROBINSON was a joint recipient (in partnership with an individual believed to be ROBINSON's spouse, Kelly ROBINSON (DOB: 11/14/1985)) of approximately $5,099. In addition, between July and September of 2022, ROBINSON was a joint-recipient with Kelly ROBINSON for an approximate additional $10,626. Your Affiant has not determined whether ROBINSON, or Kelly ROBINSON, is the intended recipient of these amounts but the receiving account information appeared to indicate that both parties maintained ownership. While Your Affiant suspects, based on limited information, that these amounts constituted unemployment insurance, this fact is not known with 100% certainty.

### *Peer-to-Peer Facilitation of Violations of the U.S.C.*

35. In reviewing the peer-to-peer transactions, Your Affiant also observed multiple transactions for which the comments provided appeared to indicate that ROBINSON was facilitating the sale of federally illegal narcotics. This peer-to-peer information was received by Your Affiant in response to a subpoena for the information and provided account and transaction information related to ROBINSON's CashApp account. This CashApp account was identified by association with the **subject device** phone number.

36. Your Affiant observed that on 09/24/2024 and 09/14/2024, at approximately 2:20PM and 8:13PM UTC, ROBINSON received eighteen (18) and five (5) dollars from an individual identified as "Kyle Fisher". Both of these transactions included a subject of "tree" which

Your Affiant knows, based on training and experience, to be a common phrase utilized to reference marijuana.

37. Between 06/27/2021 at 11:38PM UTC and 01/09/2025 at 12:06AM UTC, the user identified as Kyle Fisher sent money to ROBINSON across approximately forty-two (42) transactions. The total amount of these transactions was approximately $989.31. These transactions also included comments or statements such as "quarter" (on 11/05/2024 at 12:13AM UTC - $15), "quarter or most I can get" (on 09/16/2024 at 7:59PM - $20), "as much as I can from cheapest oz" (on 05/11/2024 at 11:23PM UTC - $5), and "thank u for being patient" (on 10/15/2024 at 6:32PM UTC - $100).

38. Based on Your Affiant's training, knowledge, and experience, the transactions between ROBINSON and "Kyle Fisher" are indicative of the ongoing and continued practice of the sale of marijuana from ROBINSON to "Kyle Fisher".

### *Peer-to-peer Involvement and Facilitation of MCD Transactions*

39. In reviewing the peer-to-peer transactions, Your Affiant observed two (2) transactions between ROBINSON and an individual identified as "Aiden Fritz". An individual identified as Aiden FRITZ (DOB: 03/30/2003) has recently been charged in the District of Colorado with violations related to the possession and manufacture of machine-guns or machine-gun conversion devices ("MCDs").

40. On 11/30/2024 at 9:44PM UTC, "Aiden Fritz" transferred eighty (80) dollars to ROBINSON. This is in addition to a ten (10) dollar transaction sent by "Aiden Fritz" to ROBINSON on 09/01/2023 at 3:08AM UTC. This information directly indicated that "Aiden Fritz" was sending money to ROBINSON, but knowledge gained by Your Affiant stemming from the unrelated investigation into FRITZ indicated that "Aiden

Fritz" and ROBINSON had engaged in transactions related to ROBINSON's acquisition of MCDs from FRITZ.

41. Your Affiant learned that the investigation related to FRITZ uncovered that FRITZ was selling MCDs at a value of approximately $40 per unit and that FRITZ had advised recipients of some of the MCDs that not all MCDs were fully functional. Further, Your Affiant learned, from other law enforcement officers participating in the investigation regarding FRITZ, that on or about 12/17/2024 FRITZ had two (2) MCDs ready for delivery to ROBINSON. This would likely result in a transaction amount totaling approximately $80. Your Affiant believes that the transaction for $80 described in Paragraph 40 and the context provided in this paragraph indicate that the transaction from "Aiden Fritz" to ROBINSON for $80 was likely a refund for malfunctioning MCDs, later rectified through an unknown time and date transaction for additional MCDs.

### *Cellular Device Messaging Facilitation of Trafficking*

42. Your Affiant, in support of the ATF CSFO assistance in the investigation related to FRITZ's alleged production and distribution of MCDs, reviewed information received through that investigation to include certain contents of FRITZ's cellular device. These contents included messages between FRITZ's phone and an individual identified as "THA MAAB" with a phone number of (502) 656-9509. This phone number is consistent with the phone number ROBINSON has provided in connection with his purchase and acquisition of firearms at varying FFLs in the Colorado Springs, CO, area. Further, "THA MAAB" is consistent with a self-initiated moniker ROBINSON used in the peer-to-peer financial transaction platforms referenced in this affidavit.

23

43. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone which began with a message on 07/04/2024, at approximately 12:00PM, from ROBINSON's phone. That message read, "I still got that blue taurus for 200". A response from FRITZ's phone read, "The lil girl gun?". A response from ROBINSON's phone read, "lol yea man" and a response from FRITZ's phone read, "Damn it still shoot tho so I guess it still a gun".

   a. At approximately 1:44PM on 07/04/2024, following what appeared to be unrelated conversation, a message from FRITZ's phone to ROBINSON's phone read, "Do I need a Colorado ID to get it off you or is it just a private sale?" and a second message which read, "Cuz if I can get it today I will I need a gun frfr". Following an unrelated response, a message from ROBINSON's phone in response read, "And na not really I jus do private sales".

44. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone which began on 11/07/2024 at approximately 12:17PM with a message from ROBINSON's phone to FRITZ's phone which read, "Do u know someone that a buy this white gun I'll do 800 today". A message from FRITZ's phone in response requested more information "on build".

   a. After several messages between ROBINSON's and FRITZ's phones, including photos of the handgun in question, a message from FRITZ's phone on 11/09/2024 at approximately 12:25AM read, "I won't be able to get it rn I just bought these plane tickets but if u still got it in a min ill lyk but rn I can't do it".

b.  On 11/24/2024, at approximately 12:24PM, with limited messaging between the messages described above through subparagraph (a), a message from FRITZ's phone to ROBINSON's phone asked, "We can hook this up today?" and a response from ROBINSON's phone stated, "Yea".

c.  The handgun in the photos described in subparagraph (a) displayed limited make and model information indicating that it was likely one (1) of the three (3) Combat Armory CA-19s purchased by ROBINSON from both of the Magnum Shooting Center locations in Colorado Springs, CO, on 05/03/2024 and 05/22/2024.

 

45. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone which began on 11/24/2024 at approximately 2:19PM with a message from FRITZ's phone which read, "I got more buttons for yu". Based on the context of this and other messages observed by Your Affiant, "button" is a term used by FRITZ in

connection with the sale or distribution of various MCDs. This appeared to indicate that the possessor of ROBINSON's phone had ordered or requested, in some kind of transactional relationship, MCDs from FRITZ.

46.  Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone which began with a message at on 12/03/2024 at approximately 5:49PM from ROBINSON's phone to FRITZ's phone which read, "U think you can get a file for the super safety for ar". A message from FRITZ's phone asked, "The drop in?" and a message from ROBINSON's phone responded, "Yea".

    a.  In response, a message from FRITZ's phone read, "We make them" followed by "They work safe and auto only no semi unfortunately"

        i.  Based on Your Affiant's training, knowledge, and experience this statement from FRITZ's phone is related to the production and distribution of MCDs and their ability to fire in different modes. In this case, it appeared that FRITZ was referencing an inability for the MCDs produced by, or on behalf of, FRITZ to fire in any mode other than automatic.

    b.  At approximately 5:50PM, a message from ROBINSON's phone to FRITZ's phone read, "Can u get the file for the three position one".

        i.  Based on Your Affiant's training, knowledge, and experience, this statement from ROBINSON's phone indicated a desire to obtain the techniques to produce an item capable of permitting an AR style rifle to maintain three (3) fire positions: (1) safe, (2) semi-automatic, and (3) automatic. This appeared to indicate to Your Affiant that ROBINSON was participating in the manufacture and distribution of MCDs in a greater

capacity than a simple consumer of products manufactured and distributed by FRITZ and any alleged co-conspirators, indicating a likely conspiratorial relationship between FRITZ and ROBINSON regardless of the existence of additional co-conspirators connected to FRITZ alone.

47. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone on 12/05/2024 which began at approximately 7:57AM with a message from ROBINSON's phone to FRITZ's phone sending a URL link that appeared to direct the recipient to, or be equivalent to, the following URL link: https://hoffmantactical.com/designs/super-safety/. A follow-on message from ROBINSON's phone read, "Can you print me lik 10 of these let me know how much and how soon".

    a. Information obtained from following the provided URL appeared to indicate that the product requested by the possessor of ROBINSON's phone is designed to function in both a two-position and a three-position AR-style firearm platform, further supporting the suspicions stated above in Paragraph 15 stemming from the message exchange between FRITZ's phone and ROBINSON's phone related to firing modes and concerning the possession or acquisition of MCDs by ROBINSON in conjunction with the manufacture or conspiracy to manufacture MCDs by FRITZ.

48. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone on 02/25/2025 at approximately 10:03AM which began with a message from ROBINSON's phone which read, "You got any lo los that are ready now got a buyer." A response from FRITZ's phone read, "None ready to go, big lo or like my lo". A response

from ROBINSON's phone read, "Lil one lik 9 teen" and a response from FRITZ's phone read, "Would have to order rails and trig block to have complete ready to go lo like the store minus trigger assmb".

    a. Based on Your Affiants knowledge, training, and experience, this exchange between ROBINSON's phone and FRITZ's phone is indicative of behaviors associated with firearms trafficking and conspiring to traffic firearms between FRITZ and ROBINSON, or the respective possessors of their cellular devices, and unknown third parties.

49. Your Affiant observed a message exchange between FRITZ's phone and ROBINSON's phone which occurred on 03/02/2025 at approximately 7:32PM and began with a photo of a Glock handgun for sale. The message from FRITZ's phone read, "We can get this?". A visible URL at the bottom of the screenshot showed "sdsguns.com". SDS Guns is a FFL located in Colorado Springs, CO, and the photo exchanged between FRITZ's phone and ROBINSON's phone displayed a listed sales price of $415.90.

    a. A response from ROBINSON's phone read, "Yea its 450" and a response from FRITZ's phone read, "Imma lyk when I sell mine and I'll lyk".



50. Based on the information throughout, Your Affiant believes that there is probable cause to believe that evidence related to violations of 18 U.S.C. § 922(o), 18 U.S.C. § 922(a)(6), 18 U.S.C. § 371, and 21 U.S.C. § 841, and encompassing the time period of 09/14/2020 through present day, is present on the cellular phone belonging to ROBINSON and associated with the phone number (502)-656-9509.

***Seizure of Subject Device***

51. On 05/08/2025, Your Affiant, in coordination with additional ATF personnel from the Colorado Springs Field Office and Army Criminal Investigations Division personnel executed Federal Search Warrant #25-SW-00661-SBP at Fort Carson, CO and seized the

**subject device** from ROBINSON. Pursuant to that search warrant, the **subject device** is currently subjected to forensic examination by ATF Denver personnel. This search warrant application is being submitted to clarify and expand the search authorizations requested under **Attachment B**.

52. During the execution of the above-mentioned search warrant, ROBINSON identified the **subject device** as his personal cellular device, distinguishing it from an employer owned device simultaneously in his possession. ROBINSON also confirmed his cell phone number as (502) 656-9509 in identifying his personal device, the **subject device**. In identifying the **subject device**, ROBINSON provided Your Affiant with the passcode for the **subject device** allowing Your Affiant to specifically identify the make, model, and serial number. The device depicted a serial number of #JHFMVGWJ4H.

53. Following the execution of the search warrant described above, ROBINSON met with investigators for a consensual post-Miranda interview on 05/08/2025 on Fort Carson, CO. ROBINSON was able to recall some known firearm purchases which have been recovered by law enforcement, including other incidents not previously known to investigators in which ROBINSON's purchased firearms have either been associated with potentially unlawful activity or allegedly recovered by law enforcement. ROBINSON's recollection of those events, however, or the totality of his recollection related to known firearms purchased and knowledge related to MCDs, appeared incomplete at the time of interview and did not entirely mitigate the known law enforcement recoveries or the facts known to be associated with those recoveries.

### *Attorney-Client Privileged Materials*

54. If the government becomes aware of a reasonable possibility that seized materials may

include attorney-client privileged information, the government will implement filter protocols to safeguard attorney-client privileged materials and segregate those materials from review by any member of the investigative team.

### *Conclusion*

55. Your Affiant respectfully requests, based on the peer-to-peer financial transactions and messaging oberserved on FRITZ's phone, that probable cause be found to believe that evidence of violations of 18 U.S.C. § 922(o), 18 U.S.C. § 922(a)(6), 18 U.S.C. § 371, and 21 U.S.C. § 841 is present on the cellular phone device(s) belonging to Kenneth ROBINSON and a search warrant be issued for the contents of the **subject device** in accordance with this application.

Respectfully submitted,

*s/ Zachary Adams*
Zachary Adams
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me on May ___16___, 2025

_____
THE HON. CYRUS Y. CHUNG
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**This affidavit has been reviewed and is submitted by Assistant U.S. Attorney Daniel R. McIntyre.**

31